Darlene DAVIS, a/k/a Darlene
Davis Slade, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–1578.

District of Columbia Court of Appeals.

Argued May 30, 1995.

Decided Dec. 28, 1995.

541(a)(1) (1993). During initial deliberation, the jury had informed the court that it was "deadlocked" and requested further instruction. However, before further instruction could be provided, the jury informed the court that it had reached a verdict. During a jury poll, following the foreperson's announcement of a guilty verdict, juror number three answered "not guilty." The trial court ended the poll and instructed the jury to resume deliberation. The jury again informed the court that it was "deadlocked." The trial court, despite objection by appellant's counsel and reluctance by the prosecution, gave the jury a *Winters v. United States,* 317 A.2d 530 (D.C.1974) (en banc) instruction.[1] The jury found appellant guilty. In an appeal to this court, appellant asserts that the trial court, under these circumstances, committed reversible error in giving the *Winters* instruction. We agree and reverse the conviction.

Neal Goldfarb, appointed by the court, Washington, DC, for appellant.

Diana Harris Epps, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Robin Ashton, Assistant United States Attorneys, Washington, DC, were on the brief, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and MACK, Senior Judge.

MACK, Senior Judge:

After a trial by jury, appellant was convicted of unlawful distribution of a controlled substance in violation of D.C.Code § 33–

## I.

The evidence, when viewed in the light most favorable to the government, reveals that one of three undercover agents, in a "buy/bust" operation, approached a black female (later identified as Debra Bunn) on a city block. This would-be purchasing officer gave Bunn prerecorded police funds and requested narcotics. Bunn led this officer to a specific address where another woman, wearing a white and pink outfit, answered the door, received the funds, closed the door,

---

1. The trial court gave the following version of the *Winters* instruction:

In a large proportion of cases absolute certainty cannot be attained or expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of the other jurors, yet, you should examine the questions submitted to you with candor and with proper regard and deference to the opinions of each other. You should consider that it is desirable that this case be decided; that you are selected in the same manner and from the same source from which any future jury must be. And there is no reason to suppose that the case will ever be submitted to 12 persons more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on one side or the other.

And with this view, it is your duty to decide this case if you can conscientiously do so. You should listen to each other's arguments with a disposition to be convinced. Thus, where there is disagreement, jurors for acquittal should consider whether their doubt is a reasonable one which make no impression upon minds of others equally honest, equally intelligent with themselves and who have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath.

And on the other hand, jurors for conviction ought seriously to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in with others by whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellow jurors.

And with that additional instruction I'd ask you to resume your deliberations.

again opened the door, and handed Bunn loose rocks which Bunn turned over to the purchasing officer. The purchasing officer broadcast a description of the woman (at the specific address) to an arrest team and the two other agents broadcast a look-out for Bunn. An investigating officer found a woman in pink and white clothing at the specific address and arrested her. Bunn was likewise apprehended. The purchasing officer identified appellant and Bunn as the two female participants in the illegal drug transaction. Appellant called one witness and asserted the defense of mistaken identification.[2]

Following the evidence, the arguments and instructions, the case was submitted to the jury which commenced its deliberations at 12:30 p.m. At 4:30 p.m., the court received a note from the jury requesting clarification of aiding and abetting. The court reinstructed the jury on aiding and abetting and deliberations resumed until 5:00 p.m. The next morning, at approximately 9:30 a.m., the jury resumed deliberations. At 10:48 a.m., the court received a second note which, due to another matter, was not discussed with counsel until 1:00 p.m. The note informed the court that the jury was deadlocked and would like further instruction. The court proposed to give a *Winters* instruction. Appellant's counsel moved for a mistrial, which the court denied, and requested an alternative anti-deadlock instruction discussed in Judge Gallagher's concurrence in *Winters, supra* note 1, 317 A.2d at 539. However, during these discussions the jury informed the court that it had reached a unanimous verdict.

The jury was brought to the courtroom, where the foreperson announced a verdict of guilty. A jury poll was initiated following the request of appellant's counsel and the third juror stated "not guilty." The court ended the poll, dismissed the jurors for lunch and asked that they resume deliberations following lunch. At 2:45 p.m., the jury sent another note to the court expressing confusion about the charges and wanting "to know

if the charge of distribution of cocaine is indeed separate or if it is inclusive with aiding and abetting the sale of cocaine."

The trial court informed the jury that only one charge was pending against appellant and that aiding and abetting was not a charge, but rather the theory the government had chosen to pursue in order to meet its burden of proof. The jury resumed deliberations and, at 3:36 p.m., informed the court that it was again deadlocked. The court suggested that the *Winters* instruction be given the next morning. The prosecution deferred to the court's discretion, but expressed some concern that the anti-deadlock instruction might be "overly coercive." Appellant's counsel moved for a mistrial, asserting that the third juror was the holdout and the *Winters* charge would be inappropriate. The trial court denied the motion. Appellant's counsel again suggested that Judge Gallagher's alternative version of the *Winters* charge be given.[3] The trial court rejected the alternative instruction and decided to give the *Winters* instruction the next morning. The court dismissed the jury and asked it to return the following morning to receive further instruction and to continue deliberation.

The next morning, defense counsel renewed her objection to the *Winters* instruction. Specifically, counsel argued that if the court knows the numerical division of the jury, a *Winters* instruction could be overly coercive. Counsel expressed concern that because juror number three had said "not guilty" during the polling, the *Winters* instruction would be too coercive. The court reaffirmed its decision to give the *Winters* charge, explaining:

> I don't consider the Winters Instruction in this context to be any more coercive than it is in any situation for the reason that whenever a jury has not decided and has told you that they can't decide a case and you Winterize them, you know there is a division. And frankly, that's all we know

---

2. Another of the undercover agents, acting as a look-out, testified that he saw Bunn enter the premises (leaving the purchasing agent outside alone) and a few minutes later, exit. He did not see the transaction between Bunn and Brooks.

3. *Winters, supra,* 317 A.2d at 539 (Gallagher, J., concurring).

here. All we know here is what we know in any case where we give a Winters Instruction, and that is, there is a division. And we do know that in every case. Every single solitary case in which we give the Winters Instruction we know there is a division. If there wasn't a division, there would be no need for the Winters Instruction. And so just knowing the division is not enough.... I don't think the answer is just to ask them to resume their deliberation.

\* \* \* \* \* \*

I fall on the side of giving them the Winters Instruction because in light of the reasonableness of their notes and in light of the way I think I handled the poll when it came back Number 3 saying not guilty, I don't think anything I do at this point in terms of a Winters Instruction is coercive. After all, the Winters Instruction tells them that they must vote according to their own conscience. And so—and that verdict must represent the individual judgment of each juror. All it tells them to do in essence is listen to each other. And consider their views in the light of the views of the others.

At approximately 11:17 a.m., the court read the *Winters* instruction to the jury. The jury resumed deliberations, and at 12:25 p.m., informed the court that it had reached a unanimous decision. The jury announced that it had found appellant guilty and the polling revealed that it was a unanimous verdict.

## II.

■ The issue before us is whether the *Winters* instruction given to a jury under these circumstances created the impermissible risk of jury coercion.[4] We have stated before that "if a juror is forced to abandon an honest conviction, the resulting verdict cannot stand." *Harris v. United States,* 622 A.2d 697, 701 (D.C.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1097, 127 L.Ed.2d 410 (1994). "[R]eversal must result if a juror

4. Appellant also alleges reversible error when the trial court did not allow cross-examination at trial of the purchasing police officer regarding his description, at the suppression hearing, of

was coerced into conforming to the majority's vote," *id.* (citation omitted), unless "we can ' "say with assurance that the jury freely and fairly arrived at a unanimous verdict".' " *Id.* (quoting *Smith v. United States,* 542 A.2d 823, 827 (D.C.1988) (quoting *Matthews v. United States,* 252 A.2d 505, 507 (D.C.1969))).

■ We review the issue of jury verdict coercion "from the perspective of the jurors." *Id.* Two inquiries are made to assess the possibility of coercion:

The first inquiry is into the inherent coercive potential of the situation before the court. The second inquiry requires an examination of the actions of the trial judge in order to determine whether these actions exacerbated, alleviated or were neutral with respect to coercive potential.

*Id.* at 701.

■ We have identified several factors in making such a determination. These include:

the degree of isolation of a dissenting juror (or jurors), whether the identity of a dissenting juror (or jurors) is revealed in open court as opposed to in a note, whether the exact numerical division of the jury is revealed, whether the judge knows the identity of a dissenting juror (or jurors) and whether the juror is aware of the judge's knowledge, whether other jurors may feel "bound" by a vote they have announced, and whether an "anti-deadlock" instruction has been given and, if so, whether this has occurred under circumstances where the potential for coercion is high.

*Id.* at 705.

## III.

An anti-deadlock instruction can become impermissibly coercive in certain factual situations. In *Smith, supra,* the trial court received two notes from the jury—one revealing a nine-to-three split in favor of conviction and a later note revealing an eleven-to-one split in favor of conviction. The judge did

appellant's clothing during the buy. We do not address this issue in light of our reversal on the *Winters* instruction issue.

not learn of the exact numbers because his law clerk only reported that the jury was deadlocked. The trial court gave a *Winters* instruction without letting the jury know that he did not know the numerical split. A guilty verdict was returned. We stated that "[t]here is inevitably a risk of coercion whenever a jury is divided unevenly. Any effort by the court to persuade the jury to reach an agreement after reporting its numerical split, such as giving a *Winters* instruction, may be interpreted by the minority as an implied command to agree with the majority." *Smith, supra,* 542 A.2d at 824. Thus, we concluded that "[w]hen a jury reveals its numerical division and the judge then gives a *Winters* instruction, the potential for coercion is great." *Id.* at 825.

We further found that despite the judge's insulation from learning the numerical split "[i]f the jury reasonably believes that the judge knows how it is divided, regardless of the judge's actual knowledge, *any* pressure by the judge to reach a verdict—such as a *Winters* instruction—will be understood by all jurors to be directed at the minority." *Id.* (emphasis in original). We noted that "a *Winters* instruction given after the jury, intentionally or inadvertently, reveals its numerical division is not the kind of measured judicial response the situation demands." *Id.* at 826. Thus we concluded that "coercion was probable, if not certain. Thus prejudice is presumed, and reversal is mandatory." *Id.* at 827.

In *Mullin v. United States,* 123 U.S.App. D.C. 29, 356 F.2d 368 (1966), the District of Columbia Circuit focused upon the actions of the trial court, which had declared a mistrial when the jury revealed to it a numerical split of seven for guilty, four for not guilty, and one undecided. The appellate court noted that "[i]t would have been a precarious undertaking for the Judge to give a supplemental charge to consider each other's views when he was already advised that only 4 of 12 jurors voted for acquittal." *Id.* at 31, 356 F.2d at 370.

In *Morton v. United States,* 415 A.2d 800, 801 (D.C.1980), we reversed a conviction because the circumstances "created a sufficient possibility of a coerced verdict" when a ju-ror's request to be excused following her brother's death was succeeded by a *Winters* instruction. We found that these circumstances, despite the juror's good intentions to continue jury duty under emotional strain, caused a "substantial risk of a coerced verdict." *Id.* at 802. We concluded that the "potentially coercive situation was compounded by [the trial court's] permitting hours of further deliberation and the giving of the *Winters* instruction." *Id.* at 803. We noted:

[T]he timing of the instruction could have well implied that a verdict was being demanded before the juror would be excused to attend to her personal business. We cannot know whether the juror surrendered to the pressure to be free or another juror compromised views to accommodate the bereaved one. It is sufficient that the death of the juror's brother and the following events, created a substantial possibility of diverting the jury deliberations from the essential neutral and nondistracting atmosphere.

*Id.*

In the instant case, the circumstances posed an inherent potential risk of a coerced verdict. Juror number three had been identified in open court during the jury poll as at least one, if not the only one, who did not initially agree with the verdict of guilty. Although the court did not know how the other nine jurors would have voted, we can safely infer that a minority of the jurors (and likely only one juror) were (or was) initially not in favor of the guilty verdict. Decisions in *Smith, Mullin,* and *Morton* suggest that when a numerical minority is made known to the court, be it one, three or five, the use of a *Winters* instruction is reversible error because of the substantial risk of a coerced verdict.

Although the exact division of the jury was not revealed to the trial court in this case, it is a logical inference that a minority of jurors were not in favor of the guilty verdict; one single juror had been revealed to the court as not in favor of the guilty verdict and the second jury deadlock note revealed that the jury was still undecided. From the perspective of the jury, at the

time when the court gave the *Winters* instruction, it was not unrealistic to think a verdict was being demanded and that the one juror or the hypothetically larger minority were being pressured to reach a unanimous verdict. Certainly it was reasonable for juror number three to surmise that the *Winters* instruction was directed at him or her, since he or she knew that, after the court had been told that the decision was unanimous, this juror registered disagreement in open court. In other words, juror number three was not only personally aware that he or she had been identified as a dissenter, but also knew that at the time the judge urged the jury, in the *Winters* charge, to reach a unanimous verdict, *the judge* knew that juror number three was a dissenter and perhaps the lone holdout.

■ The government asserts that the exact numerical division among the jurors must be revealed to the court in order for the *Winters* instruction to have a strong potential for coercion. However, our evaluation of jury coercion focuses on probabilities, not certainties. Here, the jury thought it had a unanimous guilty verdict. Therefore, the in-court identification of one juror who disagreed with the initial verdict reveals a high probability that a minority of jurors, with a strong possibility of a minority of one, was not in favor of the guilty verdict. Although, as the government asserts, any combination of divisions was possible, it is very probable that a small minority was not in favor of the guilty verdict.

■ The government also suggests that the jury was only confused and was not coerced. The likelihood that the mispoll resulted from confusion may be ruled out here. This was a one-defendant trial. Initially, the jury's notes to the court did indicate some confusion about the number and characteristics of the charges. However, after the trial court's clear instruction that the one charge was that of distribution of cocaine and that aiding and abetting was not a charge but a theory, the jury returned again from deliberation to say that it was still deadlocked. The *Winters* instruction, following this series, ex-

acerbated the potential for coercion. This case is unlike *Harris,* 622 A.2d 697, where the twelfth juror indicated some confusion during the jury poll and the trial court took a neutral approach, refusing to give an anti-deadlock instruction, sending the jury back to continue deliberation, and giving a *Crowder* [5] instruction that reduced potential for coercion. Here the anti-deadlock instruction was given following the public revelation that a probable minority, likely of one, disagreed with the initial verdict of guilty. As in *Smith, supra,* "coercion was probable, if not certain[,]" and therefore "prejudice is presumed, and reversal is mandatory." 542 A.2d at 827. We are convinced that appellant must have a new trial.

*Reversed.*

---

**5.** *Crowder v. United States,* 383 A.2d 336 (D.C.    1978).