Abdennacer **BENLAMINE**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 94–CM–739.

District of Columbia Court of Appeals.

Submitted March 25, 1996.
Decided April 24, 1997.

Denise D. Green, appointed by the court, was on the brief, Detroit, MI, for appellant.

Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Anna Matheson, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

WAGNER, Chief Judge.

Appellant, Abdennacer Benlamine, was charged in three separate counts for assaults on Leila R. Barconey (Count B), Patrice S. Drew (Count C), and Tembani S. Xaba (Count D) in violation of D.C.Code § 22–504(a) (1981). Following a jury trial, Benla-

mine was found guilty of count B, and the jury deadlocked on counts C and D. The court declared a mistrial as to counts C and D and continued the case for sentencing as to count B and for a status hearing on the unresolved counts. The court sentenced Benlamine to 180 days, suspended execution of the sentence and placed him on unsupervised probation for six months and fined him $100. Benlamine's principal argument on appeal is that the trial court erred in denying his motion for a mistrial because its anti-deadlock instruction to the jury after the public revelation of a minority for acquittal created an impermissible risk of a coerced verdict. We agree that under this court's holding in *Davis v. United States*, 669 A.2d 680 (D.C.1995), reversal is required on the facts of this case.[1]

## I.

According to the record, following presentation of the evidence, closing arguments and instructions, the jury commenced deliberations on Friday, April 29, 1994 at 4:06 p.m. The jury was excused for the weekend at 5:03 p.m. and resumed deliberations on Monday, May 2nd at 9:30 a.m. At 9:45 a.m., the jury sent the court a note requesting "the document that states the interpretation for the charges" and the verdict form. In open court, the jury clarified that it wanted the court to explain again what constituted an assault. With the approval of counsel, the court instructed the jury on the elements of assault.

At 10:59 a.m., the jury notified the court that it had reached a verdict on one count and had deadlocked on the other two. The parties assented to taking the verdict on the resolved count. Defense counsel moved for a mistrial on the remaining counts, which the court denied. Defense counsel suggested that the court inquire of the jury whether further deliberations would be helpful, and if their response was no, that the court provide a *Winters* instruction.[2] The court denied the defense request for a *Winters* instruction, explaining that it was too soon and that it was not clear that the jury was "hopelessly deadlocked." The court indicated that it would take the partial verdict and then instruct the jury "as to the other counts, I would like [ ] you [to] sit down, calmly and dispassionately and see if you can resolve the issue and return an appropriate verdict."

The jury, through its foreperson, delivered in open court a verdict, reporting that it found Benlamine guilty of Count B. At the request of defense counsel, the trial court polled the jury. Each juror agreed with the verdict until the court reached juror number nine, who stated "I have a different verdict." The parties agreed that the court should give standard jury instruction No. 2.93, "Return of the Jury After Polling," including two optional paragraphs which are intended to avoid potential coerciveness.[3]

At 12:02 p.m., the jury sent another note requesting a reading of the testimony of one of the government's witnesses. The court instructed the jury that the witness' testimony was not available and that they should

---

1. Benlamine also argues that the trial court erred in failing to reinstruct the jury on self-defense when it reinstructed the jury, at the jury's request, on the elements of assault. In light of our disposition of the case, we need not address this argument.

2. *See Winters v. United States*, 317 A.2d 530 (D.C. 1974) (en banc).

3. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.93 (4th ed.1993). The instruction as given by the trial court was as follows:

In the polling of the jury it has become apparent that you may not have reached a unanimous verdict. For this reason I'm asking you to return to the jury room for further deliberation of your verdict. If you are unanimous the

foreperson should so indicate, and I will poll you again. If you are not unanimous, please resume deliberations and see if you can reach a unanimous verdict.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations do not hesitate to re-examine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion [of] you[r] fellow jurors or for the mere purpose of returning a verdict.

rely upon their own recollections of her testimony. The court informed counsel that it planned to excuse the jury for a luncheon recess from 12:30 p.m. to 1:45 p.m. and that counsel could be excused during that period because the court would take up no further matters in the case until 1:45 p.m. At 12:40 p.m., the jury sent another note which stated that it was unable to reach a unanimous verdict on any count. When the court informed the parties of the note, the government requested a *Winters* instruction. Defense counsel objected and moved for a mistrial, arguing that the court's earlier instruction had included two optional paragraphs which were similar to the *Winters* instruction and that the additional instruction would create "a further danger of coercion." Over defense objection, the court determined that it would give the *Winters* instruction. The court denied the defendant's request for the alternative instruction which was proposed by Judge Gallagher in the concurring opinion in *Winters*. *See Winters, supra* note 2, 317 A.2d at 539. Prior to reinstructing the jury, the court inquired whether the jury remained "hopelessly deadlocked," and members of the jury reported that they were. The court then gave the *Winters* instruction which is set forth in the margin of this opinion.[4] At a bench conference which followed, defense counsel requested that the court supplement the *Winters* instruction with the two optional paragraphs of Instruction 2.93 taken from *Crowder v. United States*, 383 A.2d 336 (D.C.1978) which it had given earlier. After discussing the similarities between instruction 2.93 and the *Winters* instruction (No. 2.91), the court denied the request and allowed the jury to continue deliberations. At 2:40 p.m., the jury asked to hear the tape recording of the "911" call made by the complaining witness in Count B, Leila Barconey. The court replayed the tape, and the jury was excused to resume deliberations. At 3:20 p.m., the jury sent a note indicating that it had reached a verdict on one assault count, but that it was unable to reach a verdict on the remaining counts. The jury returned a verdict of guilty on Count B, and the poll confirmed unanimity on that count. A poll also confirmed the jury's inability to reach a verdict on the remaining counts.

## II.

Benlamine argues that the trial court erred in providing a *Winters* instruction to a deadlocked jury after it revealed its numerical division in open court. He contends that the circumstances here created a substantial risk of a coerced verdict, and therefore, reversal is required. Although conceding that there was some potential for juror coercion, the government contends that the trial court took measures which alleviated that risk. We consider first the legal principles which guide our disposition of the issue and then their application to the circumstances presented in this case.

■ When a jury poll conducted pursuant to Super. Ct.Crim. R. 31(d) reveals that

4. The court gave the following instruction:
I have a special instruction to give you at this time. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must be the verdict of each juror and not a mere acquiescence in the conclusion of other jurors, you should examine the questions submitted to you with candor and with proper regard and deference to the opinions of each other. You should consider that it is desirable that the case be decided; and that the same source from which any future jury must be selected. And there is no reason to suppose that the case will ever be submitted to 12 persons more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on one side or the other. And with this view, it is your duty to decide the case if you can conscientiously do so. You should listen to each other's arguments with a disposition to be convinced. Thus, where there is disagreement, jurors for acquittal should consider whether their doubt is a reasonable one which makes no impression upon the minds of others, that is other jurors equally honest, equally intelligent with themselves, and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. On the other hand, jurors for conviction ought seriously to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in by others with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellow jurors.
*See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.91 (Alternative B) (4th ed.1993).

a verdict is not unanimous, there is a potential danger of coercion.[5] *See Crowder, supra,* 383 A.2d at 342 (citing *Kendall v. United States,* 349 A.2d 464, 466 (D.C.1975)). The trial court has considerable discretion in assessing the impact of the dissenting vote and in determining whether to allow the jury to continue deliberations. *Harris v. United States,* 622 A.2d 697, 700 (D.C.1993), *cert. denied,* 510 U.S. 1129, 114 S.Ct. 1097, 127 L.Ed.2d 410 (1994) (citing *Crowder,* 383 A.2d at 340). In exercising its discretion, however, the trial court must seek to dissipate any potential for coerciveness and insure that the jury arrives at any subsequent verdict freely and fairly. *Crowder,* 383 A.2d at 342. The trial court is in the better position to assess whether a juror who has expressed dissent to a reported verdict acquiesces freely to the subsequent verdict, and we review its decision to grant or deny a mistrial in such a situation for an abuse of discretion. *Id.* at 341–42. However, reversal is required when it appears from the circumstances that a juror was forced into conforming to the majority's vote. *Harris,* 622 A.2d at 701; *Coleman v. United States,* 515 A.2d 439, 453 (D.C.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987).

 We review a claim of juror coercion from the "perspective of the jurors." *Davis, supra,* 669 A.2d at 683 (quoting *Harris, supra,* 622 A.2d at 701). Our consideration of the issue involves generally inquiries into two areas: (1) the inherent coercive potential of the circumstances; and (2) any actions of the trial court which may have exacerbated or alleviated the coercive potential of the situation. *Davis,* 669 A.2d at 683. Among the factors which guide our determination of the issue are:

> the degree of isolation of a dissenting juror (or jurors), whether the identity of a dissenting juror (or jurors) is revealed in open court as opposed to in a note, whether the exact numerical division of the jury is revealed, whether the judge knows the identity of a dissenting juror (or jurors)

and whether the juror is aware of the judge's knowledge, whether other jurors may feel 'bound' by a vote they have announced, whether an 'anti-deadlock' instruction has been given and, if so, whether this has occurred under circumstances where the potential for coercion is high.

*Id.* (quoting *Harris,* 622 A.2d at 705). Such factors must then be weighed along with the actions taken by the trial court in dispelling the potential for coercion. *Harris,* 622 A.2d at 705.

 This court has approved for use, in the trial court's discretion, the *Winters* instruction, which was given in this case, when the jury reports a deadlock. *Winters, supra* note 2, 317 A.2d at 533; *see also Carey v. United States,* 647 A.2d 56, 61 (D.C.1994). However, we have recognized that after a jury reveals a numerical split, an effort by the trial court to encourage a unanimous verdict by the use of a *Winters* instruction has a great potential for coercing a verdict. *Davis, supra,* 669 A.2d at 684. The danger is that such an instruction " 'may be interpreted by the minority as an implied command to agree with the majority.' " *Id.* (quoting *Smith v. United States,* 542 A.2d 823, 824 (D.C.1988)).

 In *Davis, supra,* this court held that there was a substantial risk of coercion requiring reversal where a *Winters* instruction was given to a deadlocked jury after it was revealed that "a probable minority, likely of one, disagreed with the initial verdict of guilty." 669 A.2d at 685. The facts in *Davis* are similar to the facts in this case. There, the court submitted the case to the jury at 12:30 p.m., and at 4:30 p.m., the court received a note requesting clarification of aiding and abetting. *Id.* at 682. The court reinstructed the jury, and deliberations continued until the end of the day. *Id.* At 10:48 a.m. the next morning, the jury sent a note indicating that it was deadlocked and needed further instruction. The court was unable to address the note until 1:00 p.m., but by this time, the jury reported that it had reached a

---

5. Super. Ct.Crim. R. 31(d) reads as follows:
 When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the Court's own motion.

If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

unanimous verdict. *Id.* The jury announced a verdict of guilty, but during a poll, the third juror responded, "not guilty." *Davis,* 669 A.2d at 682. The court terminated the poll and instructed the jury to continue deliberating. Thereafter, the jury sent a note expressing confusion about the charges, and the court reinstructed the jury.[6] *Id.* Subsequently, the jury informed the court again that it was deadlocked. The jury was dismissed, and the next morning the court gave the *Winters* charge. Thereafter, the jury reached a unanimous verdict. *Id.* at 682–83.

In *Davis,* this court reversed the defendant's conviction, concluding that the circumstances presented a substantial risk for a coerced verdict. 669 A.2d at 684. Although the exact division of the jury was not revealed, in light of the pronouncement of a unanimous verdict, we recognized that "a probable minority, likely of one, disagreed with the initial verdict of guilty." *Id.* at 685. We reasoned that the circumstances made it reasonable for the dissenting juror to believe that the *Winters* instruction was directed at him or her. *Id.* at 685. Therefore, this court concluded that, given the probability of coercion, " 'prejudice was presumed and reversal mandatory.' " *Id.* (quoting *Smith, supra,* 542 A.2d at 827).

We perceive no meaningful distinction between *Davis* and this case which would warrant a different result. Indeed, in some respects, this case presents a stronger case for finding a probability of coercion. Here, the dissenting juror heard the pronouncement of a unanimous verdict by the foreperson as well as confirmation of that verdict by eight of her fellow jurors before she expressed a contrary position. Thus, there was clearly a minority favoring a guilty verdict, while in *Davis,* only a minority had even responded to the poll. Thus, the dissenting juror in *Davis* had heard only two jurors confirm the verdict announced by the foreperson. As we stated in *Harris, supra,*

> less inherent coercive potential would be found if the dissenting juror was earlier in line because the precise numerical division of the jury would not be revealed; the juror would not necessarily be the only dissenter and the poll could be terminated without requiring the remaining jurors to commit themselves in open court.

622 A.2d at 703.

The government argues that *Davis* can be distinguished from the facts in this case. First, it points out that, unlike *Davis,* the trial court here gave an instruction immediately after the poll which served to dissipate the coercive potential, *i.e.,* criminal jury instruction 2.93, including language recommended by this court in *Crowder.* In *Crowder,* we suggested supplementing instruction 2.93 with specific language which might alleviate the dissenting juror's fears that the trial court was requiring further deliberations to eliminate the dissent. *Crowder, supra,* 383 A.2d at 342. Essentially, the instruction informs the jury that it should deliberate with the view to reaching unanimity, but that jurors should not surrender their honest convictions as to the weight or effect of the evidence solely because of the opinions of the other jurors.[7] *Id.* While a *Crowder* instruction at the time of the revelation may alleviate the coercive effect of further deliberations after a lone dissenter is revealed, the question here is whether it has that continuing effect after the jury announces subsequently that it is deadlocked and the court give the *Winters* instruction. While the court's earlier *Crowder* instruction emphasizes that each juror should decide the case for himself or herself, the *Winters* instruction, as the government acknowledges, places emphasis on the desirability of the jury reaching a unanimous verdict.[8] Thus, the subsequent *Winters* instruction may well

---

6. The jury inquired whether the charge of distribution of cocaine was a separate charge or included within aiding and abetting the sale of cocaine. *Davis,* 669 A.2d at 682. The court instructed the jury that there was only one charge and that aiding and abetting was the theory upon which the government sought to prove the charge. *Id.*

7. The instruction is set forth in its entirety at note 3, *supra.*

8. *See* note 4, *supra.*

have reinforced those portions of the earlier *Crowder* instruction which stated that it was the jurors duty "to consult with one another and to deliberate with a view to reaching an agreement...." The trial court recognized this overlap in the optional *Crowder* language when it rejected the request of defense counsel to add the language to the *Winters* charge.[9] Therefore, we are not persuaded that the *Crowder* instruction given at the time of the revelation of the split prevented the coercive effect on the later developments which occurred here.

Second, the government argues that before the trial court gave the *Winters* instruction, the earlier coercive situation had been dissipated and the dissenting juror was no longer singled out. It reaches this conclusion because of the last note from the jury in which it informed the court that "a unanimous verdict on any of the counts will be impossible to reach." Therefore, the government contends, the trial court did not know the numerical split at that time. However, these circumstances might reflect just as well that the majority had been unable to convince the recalcitrant juror to change his or her vote. That juror remains singled out as the likely holdout, thus maintaining the coercive potential. *See Davis, supra,* 669 A.2d at 683.

Third, the government argues that the record in this case, unlike *Davis,* reflects that the jury genuinely continued to deliberate after the *Winters* instruction. Specifically, the jury requested to listen to the "911" tape and did not reach a verdict until about forty minutes later. In *Davis,* the jury requested clarification about the charges after the poll revealed a lack of unanimity. Yet, this court did not hold that the coercive potential of the revelation upon the dissenting juror was removed because of the jury's subsequent inquiry concerning the charges. *See Davis, supra,* 669 A.2d at 685. The *Davis* court concluded that "[t]he *Winters* instruction, following this series, exacerbated the potential for coercion." *Id.* In Benlamine's case, the jury requested the tape after the poll, the *Crowder* instruction and the *Winters* instruc-

tion. In light of *Davis,* we cannot conclude that the substantial risk of a coerced verdict was removed.

Finally, the government argues that in this case, the jury was deadlocked on two of the three counts from the beginning and remained so after the *Winters* instruction was given. These circumstances, the government contends, demonstrate that the jury did not feel coerced into reaching a verdict. However, the revelation during the poll came only as to the one count on which the jury ultimately returned a guilty verdict. The dissenter never stood alone on the deadlocked counts. Therefore, the case is not so distinguishable from *Davis,* which involved only a single count. The pressures upon the lone dissenter who is revealed in open court are the same in each case. In light of *Davis,* we are constrained to hold that coercion was probable; therefore, reversal is mandatory. 669 A.2d at 685.

For the foregoing reasons, the judgment of conviction appealed from hereby is reversed, and the case is remanded for a new trial.

*Reversed* and *remanded.*

---

9. We have no occasion to express a view on the effect of adding the *Crowder* language to the *Winters* charge.