**Keith HANKINS, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 07–CF–1015.**

District of Columbia Court of Appeals.

Argued Nov. 25, 2009.

Decided Sept. 2, 2010.

merge. *Nixon*, 730 A.2d at 152; *Tolbert*, 905 A.2d at 190.

Peter H. Meyers, Washington, DC, for appellant.

Anne Y. Park, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time, and Roy W. McLeese III, Elizabeth Trosman and Nihar R. Mohanty, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and PRYOR, Senior Judge.

GLICKMAN, Associate Judge:

■ At appellant Keith Hankins's murder trial, the jury sent a total of three notes reporting that it was hung. Shortly before the third note, a juror complained privately to the courtroom clerk during a break that one juror had stopped participating in the deliberations. When, at the trial judge's direction, the clerk spoke to the foreperson to ensure that any future complaints would be made to the court in writing, the foreperson unexpectedly told the clerk that the juror in question was participating again but was unalterably convinced that the defendant was not guilty. After the judge informed counsel of the third "hung jury" note and of the clerk's conversations with the two jurors, the judge decided to give an anti-deadlock instruction. Appellant's primary claim is that, by giving the anti-deadlock instruction under the foregoing circumstances, the judge improperly coerced the jury into returning a guilty verdict. We conclude, however, that the judge took sufficient precautions to avoid the risk of coercion. Accordingly, we affirm appellant's convic-

tions.[1]

## I.

After the jury in appellant's first trial was unable to reach a verdict, he was retried and convicted of murdering Conrad Fox on January 9, 2005, in a parking lot outside a convenience store located at 2420 Martin Luther King Avenue, S.E. The evidence of appellant's guilt, while sufficient to support his conviction, was not overwhelming. One witness claimed to have seen appellant, whom he knew, shoot Fox, but his testimony was impeached and contradicted in various respects. A second witness disavowed her earlier grand jury testimony, in which she too had implicated appellant in the shooting. Although the incident was captured on videotape by the convenience store's security camera, the tape was of poor quality, and appellant could not be identified as the shooter. The owner of the store knew appellant and observed that the shooter did not walk with a limp, as did appellant. Finally, a fourth witness testified that appellant had told him the day after the shooting that he recently had shot someone in the chest with a handgun. This witness was hoping to win a substantial reduction of his prison sentence by cooperating with the prosecution, and the admission he attributed to appellant arguably conflicted with the medical examiner's testimony that Fox was shot in the back.

The jury's deliberations stretched over four days. Beginning in the afternoon of the second day, the jury sent three notes reporting that it was unable to reach a unanimous verdict. The first note read: "We are divided as a jury and are unable to come to agreement. How should we proceed?" After conferring with the parties, the judge excused the jurors and asked them to return to their deliberations the following morning. At 11:10 that morning, the jury sent its second note, declaring that "We are divided as a jury. We are challenged with a lack of participation and communication." In light of the vagueness of this pronouncement, the judge declined to follow the government's suggestion that it inquire of the jury to determine whether there was actual juror misconduct. The judge also denied defense requests for a mistrial or an anti-deadlock instruction. Instead, to address the concern expressed in the note, the judge decided to remind the jurors of their obligation to "deliberate in a productive way" and "with an open mind," while also emphasizing that no juror should "feel any pressure from [the court] to give up his or her strongly held convictions." The judge then excused the jury for lunch. The jury resumed its deliberations at 2:00 p.m.

The jury's final note and the circumstances surrounding it are at the center of this appeal. At 3:50 p.m., the courtroom clerk received the note and brought it to the judge's attention. The note read, "We are unable to reach a unanimous decision and are at an impasse." At this time, the clerk informed the judge of her contact with a female juror about an hour earlier.

---

1. Appellant's other claim on appeal is that the trial judge failed to take appropriate action when the prosecutor reported that a juror appeared to have been asleep during the government's case-in-chief. *See Samad v. United States*, 812 A.2d 226, 230 (D.C.2002); *Golsun v. United States*, 592 A.2d 1054, 1057 (D.C. 1991). At trial, however, appellant agreed that no immediate action was necessary and that the judge should monitor the situation further ("keep an eye on it") before intervening. As the judge followed the course of action appellant preferred, and as the issue was not raised again at trial, we think appellant has waived any claim that the judge abused his discretion. Nor, in the absence of an objection at trial, can appellant show any likelihood that he was prejudiced by the judge's failure to take further action on the sleeping juror report.

The clerk was escorting the juror to an ice machine during a break when the juror remarked to her that she was "very frustrated" because there was "one juror" who, having "stated what his decision was," had "backed away from the table" and was "no longer" speaking or participating in the deliberations.

Under the mistaken impression that the juror with whom the clerk had spoken was the jury's foreperson, the judge asked the clerk to go back and tell the foreperson that if he wanted the court to address the juror's non-participation, he would have to report it to the court in a written note. The clerk proceeded back to the jury room, asked the foreperson to step outside, walked with him down the hallway, and asked him if he was "going to send another note and if he was still having problems with that one juror." According to the clerk, the foreperson answered that, after the clerk's earlier conversation with the female juror, "they" had talked to the uncooperative juror, and "[the juror] participated," though "he had made up his mind [a]nd he wasn't changing his mind about anything." "[T]hat one juror had decided that the defendant was not guilty," the foreperson unexpectedly added, and he doubted further instruction "would make that juror change his mind."

The judge promptly reported the third jury note, as well the two conversations between the courtroom clerk and the jurors, to the parties. The clerk testified as described above to the substance of those conversations. Had the juror conversations not happened, the judge said, he would have been inclined to respond to the third jury note with an anti-deadlock instruction. However, the judge said, the foreperson "regrettably" had provided the clerk "more information than anyone was expecting." As a result, the judge observed, it was possible "that the juror who apparently has stated his firm position may be in a minority of one [and] would either know or suspect that his status as being in a minority of one has been communicated . . . to the Court, and that the Court's anti-deadlock instruction is aimed at him." On the other hand, the judge reasoned, this was "wildly speculative," inasmuch as the numerical split in the jury had not been revealed, the juror in question had not been identified, and there was "no reason" to believe that juror knew of the other jurors' conversations with the clerk (which had occurred out of the hearing of the other jurors). The prosecutor and defense counsel debated whether an anti-deadlock instruction would be coercive in these circumstances. Recognizing the lateness of the hour, the judge excused the jurors for the day, telling them that he and the parties were still conferring as to "the most appropriate way" to respond to their last note.

After an opportunity for legal research and further colloquy with counsel the next morning, the judge concluded that "there would not be an unacceptable danger" that a moderate anti-deadlock instruction would be coercive—that it "would cause whichever person or persons might be in the minority here to feel that that instruction was aimed at them or him." With appellant preserving his objection to the giving of any anti-deadlock instruction, the discussion turned to which of three alternatives the judge would select: the *Winters* instruction, the Gallagher instruction, or the *Thomas* instruction.[2] To reduce the

---

2. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.601 (5th ed. rev. 2009); *Winters v. United States,* 317 A.2d 530, 534 (D.C.1974); *id.* at 539 (Gallagher, J., concurring); *United States v. Thomas,* 146 U.S.App.D.C. 101, 108 n. 46, 449 F.2d 1177, 1185 n. 46 (1971).

potential for coerciveness, the judge limited the choice to the latter two "less aggressive alternatives."[3] As between those, the prosecutor expressed a preference for the Gallagher instruction, while appellant preferred the *Thomas* instruction. The two instructions are similar—in nearly identical words, they enjoin the jurors to "deliberate with a view to reaching an agreement," but without sacrificing their "individual judgment" or surrendering their "honest conviction as to the weight or effect of [the] evidence" because of other jurors' opinions solely in order to reach a verdict. The only substantive difference between the two instructions, which the judge noted, is that the Gallagher instruction adds an admonition to the jury to "consider that it is desirable that the case be decided if you can conscientiously do so; that you were selected in the same manner, and from the same source, from which any future jury must be[; and that] [t]here is no reason to suppose that

the case will ever be submitted to 12 persons more intelligent, more impartial, or more competent to decide it, nor to suppose that more or clearer evidence will be produced on one side or the other."[4]

The judge elected to give the jury the Gallagher instruction. In doing so, he began by commending the jury for complying with his instructions never to disclose its numerical split or the issues over which it was divided. Therefore, he stated, he had "absolutely no idea" as to how the jury was split or the direction in which it was leaning; he did not want to know any of that information and should not know it. The judge then explained that, before sending the jury back to resume its deliberations, he would read "an instruction that has been read to many juries in many cases in this courthouse over many years and that some juries have found helpful." With that preface, he proceeded to read the Gallagher instruction.[5] And at the end, he

---

**3.** As the judge explained, the *Winters* instruction, unlike the other two, directs the jurors to "listen to each other's arguments with a willingness to be convinced," and to consider "seriously" the fact that their views conflict with those of other jurors who "are equally honest and equally intelligent as themselves, and who have heard the same evidence, with the same attention, with an equal desire to evaluate the evidence and decide the case, and under the sanction of the same oath." CRIMINAL JURY INSTRUCTIONS, No. 2.601 (Alternative III.B). Our cases have recognized the coercive potential of the instruction's rather emphatic language; we have deemed it to represent the "highwater mark" of an antideadlock instruction because of the "sting" it carries in favor of a verdict. *Jones v. United States*, 946 A.2d 970, 975 (D.C.2008) (quoting *Winters*, 317 A.2d at 533, 534).

**4.** CRIMINAL JURY INSTRUCTIONS, No. 2.601 (Alternative III.C).

**5.** In so doing, the judge instructed the jury as follows:

Any verdict that you reach as to any count in the indictment must represent the

considered judgment of each juror. To return a verdict as to any charge, all 12 members of the jury must agree to that verdict. To put it another way, any verdict that you reach as to any count in the indictment must be unanimous. In continuing your deliberations, you should consider a few points.

First, that it is desirable that the case be decided if you can do so conscientiously. Second, that you were selected in the same manner and from the same source from which any future jury would be selected. And third, that there is no reason to believe that the case ever will be submitted to twelve people who are more intelligent, more impartial, or more competent to decide it or that more or clearer evidence ever will be produced on one side or the other.

In this regard, each of you has a duty as a juror in the case to consult with the other jurors and to deliberate with a view toward reaching a unanimous agreement, if you can do so without sacrificing your individual judgment. Each of you must decide the case for yourself, but you should do so only after an impartial consideration of the evidence along with your fellow jurors.

reminded the jury to put all future communications in writing, and not to reveal its numerical split if it decided to send another note.[6]

The jury resumed its deliberations at approximately 11:00 a.m. At 12:11 p.m., it sent back a note saying it had reached a unanimous decision. The verdict on each count of the indictment was guilty. In the poll that followed, every juror assented to that result..

Appellant moved for a new trial, contending that the court had coerced a verdict by giving the jury an anti-deadlock instruction. After a hearing, the judge denied the motion. Acknowledging that the issue was "not at all ... frivolous," because the circumstances did give rise to "the appearance of possible coercion," the judge nonetheless concluded there was "no substantial possibility" that the Gallagher instruction caused any juror "to abandon his or her honest convictions." The judge based that conclusion on the following findings: (1) the record showed that "one juror was uncooperative at some point and that he favored a not guilty verdict at another point"; (2) there was no information in the record as to "whether the uncooperative juror knew about either of the

conversations that the clerk had with other jurors"; (3) there was "no basis reasonably to suspect" that the reportedly uncooperative juror was told "his position had been disclosed" to the court; (4) the instructions made clear that the court was not pressuring the jurors to change their votes or give up their firmly held convictions, and "taken as a whole, were not coercive"; and (5) during the jury poll, "no juror hesitated, wavered, or delayed in answering ... that he or she voted guilty."

## II.

■■■ Whether to give an anti-deadlock instruction when a jury reports itself at an impasse, and which instruction to give, are questions committed to the trial judge's discretion.[7] It is, of course, an abuse of that discretion to give an anti-deadlock instruction under circumstances creating a substantial risk of juror coercion. "A verdict resulting from such coercion cannot stand."[8] We assess that risk by weighing the "inherent coercive potential" of the entire situation before the trial court and the ameliorative or exacerbating impact of the judge's actions in response to that situation.[9] We examine the question of coercion from the jurors' perspective.[10]

> In the course of your deliberations, you should not hesitate to re-examine your own views and the reasons for your own views. And you should not hesitate to change your opinion if you become convinced that your opinion is incorrect. Nevertheless, you should not surrender your honest beliefs as to the weight or effect of the evidence in this case solely because of the opinions of your fellow jurors or solely for the purpose of returning a unanimous verdict.
>
> You are not advocates for either side in this case. You are judges of the facts. Your sole interest is to determine from the evidence and from my instructions whether the government has proved the defendant's guilt beyond a reasonable doubt as to any charge.

6. After the jurors departed the courtroom to resume their deliberations, the judge commented that he thought his final reminder "should be interpreted reasonably by the jury to [mean] that they are not being ordered to come up with a unanimous verdict, and that they [would not be] told to stay there forever until they reach ... a unanimous verdict."

7. *Harris v. United States,* 622 A.2d 697, 705 n. 14 (D.C.1993); *Epperson v. United States,* 495 A.2d 1170, 1173 (D.C.1985).

8. *Smith v. United States,* 542 A.2d 823, 824 (D.C.1988).

9. *Harris,* 622 A.2d at 701.

10. *See Payne v. United States,* 932 A.2d 1095, 1106 (D.C.2007).

Coercion of a verdict "does not mean simple pressure to agree." [11] Rather, pressure to agree is impermissibly coercive when it is likely to force a juror "to abandon his [or her] honest conviction as a pure accommodation to the majority of jurors or the court." [12] The question is one of "probabilities, not certainties"; [13] from our review of the record, we must be able to "say with assurance" that the jury arrived at its verdict "freely and fairly." [14]

■■■■ As a rule, it is not coercive to give a standard anti-deadlock instruction when a jury has declared itself unable to agree after having deliberated for a considerable length of time. Typically, where the jury's numerical division and leaning have not been disclosed and no juror has been singled out, no members of the jury have any reason to suppose the anti-deadlock instruction is aimed at them (or at their position). As a result, no juror would have a reason to feel forced to abandon his or her conviction. In this case, however, as the trial judge appreciated, a potential for coercion arose as a result of the courtroom clerk's conversations with the two jurors. [15] As the clerk described those conversations, they reasonably suggested that one juror in particular, who favored a not guilty verdict, was frustrating the desire of the other jurors to arrive at a (presumably contrary) verdict. We do not know whether the juror in question knew about the conversations and their substance. If not, we perceive no danger that he would have felt targeted by the anti-deadlock instruction. But there was indeed that danger, the very one the trial judge specifically identified, if the juror did know about the conversations between the jurors and the clerk—for then he reasonably could have supposed that their substance had been conveyed to the judge, and that the anti-deadlock instruction was directed at him.

It is not hard to imagine that the jurors who spoke with the courtroom clerk disclosed their conversations to the rest of the jury. They could have done so before or after the judge gave the anti-deadlock instruction. They even might have done so for the purpose of persuading the dissenting juror to acquiesce in the majority's position. We have no way of knowing. The judge prudently did not attempt to inquire into whether the juror in question had been informed of the conversations, nor did either party ask the judge to do so. [16]

11. *Smith*, 542 A.2d at 824.

12. *Winters v. United States*, 317 A.2d 530, 532 (D.C.1974) (*en banc*).

13. *Davis v. United States*, 669 A.2d 680, 685 (D.C.1995).

14. *Harris*, 622 A.2d at 701 (internal quotation marks omitted).

15. In the proceedings below, the judge candidly acknowledged that, in retrospect, it was a mistake to send the courtroom clerk to speak to the foreperson. It bears repeating that "trial courts should be cognizant of the potential risks presented by individual colloquy and by responding to questions other than those formally propounded in writing through the foreperson, such as the risk that permitting and responding to individual jurors could lead to the disclosure of a numerical jury division and later allegations of a coerced verdict." *Barnes v. United States*, 822 A.2d 1090, 1092 n. 5 (D.C.2003).

16. Inquiry would have increased the likelihood that the reportedly dissenting juror would learn of the conversations if he did not know of them already, and it would have risked undue intrusion by the court into the heart of the jury's deliberations. The judge was not confronted with a complaint of ongoing misconduct on any juror's part. *See generally Brown v. United States*, 818 A.2d 179, 185 (D.C.2003).

Because the risk of coercion must be evaluated from the juror's perspective, we believe it necessary to assume, in the absence of information to the contrary, that the juror could have been told about his fellow jurors' conversations with the clerk. On that assumption, the juror could have believed the judge, too, was informed that one juror, who favored an acquittal, stood in the way of a verdict. Although neither the juror's identity nor the precise numerical division of the jury had been disclosed to the judge, there thus was a danger the juror would feel coerced by an instruction aimed at loosening the logjam.[17] That danger was heightened by the fact that the jury had been deliberating without result for a considerable length of time and had thrice reported itself deadlocked.

But "even in a situation with a high degree of inherent coercive potential," we have said that "coercion may be averted where a trial court acts with appropriate precaution."[18] The trial judge was alert to the possibility of coercion, and he took pains to avoid it. Critically, he emphasized to the jury that, in fact, he did not know how it was divided or the direction in which it was leaning. He did not single out the putatively uncooperative juror or express concern about any juror's conduct in deliberations. He eschewed a *Winters* instruction in favor of the Gallagher in-struction. And by adding that the jury should take care not to disclose its split in any future notes, the judge underscored that he was not insisting, or necessarily expecting, that the deadlock would be broken.[19]

■ Had the judge given the *Winters* instruction, we think there is a greater likelihood it would have been coercive. But the Gallagher instruction is different.[20] To be sure, it does contain what Judge Gallagher himself called "a temperate prod by the trial judge for a conscientious attempt at a verdict."[21] Even so, its overall tenor makes clear that "a verdict is *not being demanded.*"[22] The instruction reiterates that no juror should "surrender [his or her] honest conviction" or "sacrific[e] [his or her] individual judgment" for the sake of a verdict. We see no reason why any juror would have dismissed this language as window dressing, or would have supposed that, absent agreement, no end to the deliberations was in sight.[23]

The jury reached a verdict about an hour after it received the judge's instruction. That this was a short period of time compared to the total duration of the deliberations may be some indication of the anti-deadlock instruction's effectiveness, but we do not think it implies coerciveness.

17. *Cf. Smith,* 542 A.2d at 825 ("If the jury reasonably believes that the judge knows how it is divided, regardless of the judge's actual knowledge, *any* pressure by the judge to reach a verdict—such as a *Winters* instruction—will be understood by all jurors to be directed at the minority.").

18. *Harris,* 622 A.2d at 704.

19. We do not agree with appellant that the judge's statement about possible future notes from the jury implied that the judge would keep the jury deliberating indefinitely, until any hold-out jurors caved in.

20. This court never has had a case in which it found the Gallagher instruction to have been coercive.

21. *Winters,* 317 A.2d at 539 (Gallagher, J., concurring).

22. *Id.* (emphasis in the original; footnote omitted).

23. The usual presumption, absent reason to believe the contrary, is that jurors understand and follow the judge's instructions. *See Weeda v. District of Columbia,* 521 A.2d 1156, 1168 (D.C.1987).

Countering such an implication is the fact that no juror hesitated to assent to the verdict when the jury was polled.[24] We do not view this case as comparable to those in which we have reversed convictions because an anti-deadlock instruction (the *Winters* instruction) was given after polling revealed that a juror disagreed with the announced verdict.[25] Here, unlike in the poll-breakdown cases, the dissenting juror's identity was not revealed, and the judge credibly could tell the jury that he had "no idea" how the jury was split or the direction in which it was leaning.

We do not deny that this case is a close one. In light of the foregoing considerations, though, we believe we may say with the requisite "assurance" that the Gallagher anti-deadlock instruction did not operate to force any juror to surrender his or her honest convictions.

*Affirmed.*

**24.** "The purpose of the jury poll ... 'is to ascertain for a certainty that each of the jurors approves of the verdict as returned; that no one has been coerced or induced to sign a verdict to which he does not fully assent.'" *Green v. United States*, 740 A.2d 21, 25 (D.C. 1999) (quoting *Humphries v. District of Co-* lumbia, 174 U.S. 190, 194, 19 S.Ct. 637, 43 L.Ed. 944 (1899)).

**25.** *E.g., Benlamine v. United States*, 692 A.2d 1359, 1363 (D.C.1997); *Davis v. United States*, 669 A.2d 680, 684 (D.C.1995).