*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 13-CF-838

KALETE JOHNSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-8597-12)

(Hon. Stuart Nash, Trial Judge)

(Submitted January 6, 2015    Decided April 15, 2015)

*James Klein*, *Alice Wang* and *Tejal Kothari*, Public Defender Service, were on the brief for appellant.

*Ronald C. Machen Jr.*, United States Attorney at the time, and *Elizabeth Trosman, John P. Mannarino, Tejpal S. Chawla* and *David P. Saybolt*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and KING, *Senior Judge*.

THOMPSON, *Associate Judge*: A jury convicted appellant Kalete Johnson of conspiracy to rob, *see* D.C. Code § 22-1805a (2012 Repl.), acquitting him of

several other charges.[1]  Appellant contends that the trial court abused its discretion (1) in replacing a juror with an alternate, and (2) in admitting lay witness testimony about the witness's understanding of certain words he heard appellant speak.  We disagree and therefore affirm.

## I.

At appellant's trial, the government presented evidence that on December 29, 2012, appellant, accompanied by two friends, Aquil Carrington and Leonard Taylor, conspired to rob Edin Carrera of his truck.  Carrera, who was sitting in the truck with the engine running while he waited for the construction site where he worked to open for the day, testified that he noticed, through his rearview mirror, three young men approaching his truck, dressed in black jackets and black ski masks.  As the three men got closer to the truck, the tallest one (appellant, according to the government's theory) walked towards the passenger side, one walked towards the driver's side, and one stayed behind the truck.  The tallest man then approached Carrera's window, hit the window, and said, "son of a bitch, give

---

[1]  Appellant was acquitted of armed carjacking, carjacking, two counts of possession of a firearm during a crime of violence, assault with intent to commit robbery while armed, assault with intent to commit robbery, threatening to injure a person, obstructing justice, and two counts of offenses committed during release.

me the truck." Carrera testified that he was scared, so quickly drove away and, after turning a corner, stopped and called the police. Upon seeing some of his coworkers head towards the construction site, and "fe[eling] more secure," Carrera drove back to the worksite. As Carrera was returning to the worksite, he saw the police arrive and the three men run away as the police approached them. Officers apprehended the two shorter men — Carrington and Taylor — and showed them to Carrera, who identified them as two of the men who attempted to take his truck. The officers were unable to catch the tallest man, and so, began an investigation to locate him. A detective who was present at the show-up testified that Carrington and Taylor provided him with appellant's nickname, which ultimately led to the police finding appellant and arresting him.

## II.

Taylor[2] testified at trial that when appellant, Carrington, and he were walking toward Carrera's truck, Carrington said that he "wanted to get the truck[,]" and appellant responded by saying "like, All right, like, go ahead, do what you got to do." The prosecutor asked Taylor whether appellant "was . . . participating in

---

[2] The District of Columbia had brought charges against Taylor as a juvenile, but dropped the charges before appellant's trial.

this[.]" Taylor responded, "Not that I could see." The prosecutor then asked Taylor what he had understood appellant to mean when he said, "All right." Taylor responded, "Like, go [a]head." The prosecutor said, "You're testifying under oath, sir, that he didn't agree?" Taylor responded, "Right. Yeah, like, go ahead, come on." The prosecutor observed that there was "a difference" between those interpretations and asked Taylor whether he had understood appellant to say "go ahead you do it" or "go ahead we'll do it." Taylor's response was "Like, not understanding but, like, Come on." When the prosecutor asked, "So [appellant] was going to do it with [Carrington]?" Taylor responded, "I guess" (an answer that the court struck, sustaining a defense objection). The prosecutor then impeached Taylor with a portion of his grand jury testimony, which the court agreed was "different than what he's testified here in court." In his grand jury testimony, Taylor testified that when Carrington said, "[w]e're going to get this car," appellant responded, "all right" or "[a]ll right, come on[,]" meaning (Taylor agreed with the prosecutor) that appellant would "do it with [Carrington,]" i.e., would "help [Carrington] take the truck." The grand jury testimony was read to the petit jury over defense counsel's objection that the government should not be permitted to "elicit what [Taylor] believed words to mean." The trial judge overruled the objection, reasoning that "all right, come on" "is susceptible to different interpretations" and that "the inflexion of the voice, who it was said to, the

demeanor of the person who said it" were all "communication cues that can be used by someone who is actually [t]here to hear those words[,] to invest those words with one meaning over the other meaning."

Appellant now argues that the trial court abused its discretion in admitting Taylor's lay opinion testimony about the meaning of appellant's words, "all right." He argues that the words had no specialized meaning that would make Taylor's interpretation helpful to the jury. He also argues that the government failed to elicit a factual basis for the opinion, in that the prosecutor did not ask Taylor to explain how or why he reached his understanding of appellant's meaning. Appellant emphasizes that Taylor "did not claim that his opinion was based on [appellant's] inflexion or demeanor . . . [or] communication cues."

Federal Rule of Evidence 701 states the law governing opinion testimony by lay witnesses that has been adopted under the case law in our jurisdiction. *See King v. United States*, 74 A.3d 678, 681 n.12 (D.C. 2013). The Rule provides that a lay witness's opinion testimony is limited to one that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R.

Evid. 701. "The requirement that proffered opinion testimony be rationally based on the witness's perception means simply that the opinion must be one that a reasonable person normally could form based on the perceived facts." *Dunn v. State*, 919 N.E.2d 609, 612 (Ind. Ct. App. 2010) (internal quotation marks and alterations omitted). "To satisfy the helpfulness requirement, the portion of [a] conversation interpreted must be coded, abbreviated, or otherwise unclear." *United States v. Primavera Oil, Inc.*, No. 88-00028, 1988 WL 92863, at *3 (E.D. Pa. Sept. 2, 1988). "[A] lay witness is permitted to opine on the meaning of vague and ambiguous . . . statements and terms, including vague pronouns and ordinary terms used in an ambiguous fashion." *United States v. Mumphrey*, 584 F. App'x 784, 787 (9th Cir. 2014) (internal quotes omitted). The situations covered by the Rule include those in which words "would have been clear *in context* to the person hearing them, but may not be clear to one merely hearing the words." *United States v. Martin*, 920 F.2d 393, 397-98 (6th Cir. 1990) (emphasis in original). This court reviews for abuse of discretion "the admission or exclusion of evidence alleged to be in violation of Rule 701." *King*, 74 A.3d at 681.

Taylor's testimony was that he heard both Carrington's statement and appellant's reply, establishing that he had "personal knowledge of the facts from which [his] opinion [was] derived," *United States v. Baraloto*, 535 F. App'x. 263,

273 (4th Cir. 2013) (per curiam) (internal quotes omitted), and furnishing one of the foundations required for lay opinion testimony under Rule 701. Further, Taylor testified that (although he had known appellant only a few months) he was close to appellant "like a brother," and that he had been walking and talking and "working together" with both appellant and Carrington just before the statements in question were made. After Taylor gave the answers about the meaning of appellant's words that prompted the prosecutor to impeach Taylor with his grand jury testimony, the jury heard the grand jury testimony in which Taylor agreed that in saying, "All right" or "[a]ll right, come on[,]" appellant meant that he would "help [Carrington] take the truck." Thereafter, Taylor provided a factual basis for that interpretation, by going on to testify at trial that appellant "started walking up towards the truck" and went toward its "passenger hood side[.]" Thus, Taylor's testimony established the context and provided an adequate basis for his opinion about what appellant meant by saying, "All right"; in other words, taken as a whole, Taylor's testimony showed that his opinion was of a type that "a reasonable person normally could form based on the perceived facts." *Dunn*, 919 N.E.2d at 612.

Appellant further argues that Taylor's opinion about the meaning of ordinary words was not "helpful" to the jury. We agree that the words "all right" are not

"jargon" or "code." *See King*, 74 A.3d at 681-82. However, common experience teaches that speakers utter the words "all right" with varying degrees of acceptance, interest, and enthusiasm, and we therefore find reasonable the trial court's assessment that the words were ambiguous, i.e., "susceptible to different interpretations," and that Taylor's opinion testimony would be "helpful to clearly understanding the witness's testimony or to determining a fact in issue[,]" Fed. R. Evid. 701, to wit, whether appellant agreed with Carrington to take the truck. The jury, which heard from Taylor the words appellant uttered and Taylor's interpretation of those words and also heard the witnesses' varying accounts of appellant's contemporaneous actions, was free to determine the weight, if any, to be given to Taylor's interpretation.

## III.

During jury selection, the trial judge informed the venire that the trial and subsequent deliberations would likely take about eight days to complete. Juror 809 expressed to the judge concern about the financial hardship of paying for childcare if she was selected to serve. She asked for "some kind of consideration for that[.]" The judge responded, "All I can do is tell [you] we're going to move this as quickly as possible, but I'm afraid I can't[.]" Juror 809 was ultimately selected to

serve. On the fourth day of trial, she sent a note to the trial judge which read, "[I]t looks like it's going to be very difficult for me to participate in this trial next week. I can't afford my child's care anymore. I'm so sorry to tell you this now." Discussing the note with counsel for the parties, the judge explained that "[t]he trial is not going any longer than we had outlined for [Juror 809] during the selection process" and said that he was inclined to tell the juror that there was nothing the court could do to accommodate her. The judge called the juror to the bench to discuss her note. She asked the judge whether he could ask the courthouse childcare facility to accept her daughter, who did not meet the facility's minimum age requirement, but the judge stated that he could not do so.

On the Monday after the ensuing weekend, however, Juror 809 appeared at the courthouse with her husband and young daughter, again asking to be excused. The prosecutor stated that the government did not "have a problem excusing the juror." After conferring with appellant, defense counsel said that he "liked" the juror and objected to excusing her "without investigating this further." The judge decided to speak again with the juror. The juror explained that, the previous week, her husband had watched their year-and-a-half old daughter until he went to work at 1:00 p.m., and the babysitter had taken over for the rest of the afternoon, including picking up the juror's son from school and caring for him; that the

babysitter had cancelled because she was "behind on her classes"; and that the juror had "called another babysitter and - -." The juror never completed that last statement, but agreed that she had no arrangements for the day other than her husband, who had started a "new job" just two months earlier. With leave of court, the prosecutor interjected a question, asking the juror, "Is this going to be a problem . . . the rest of the week as well or is it just today?" The juror answered, "Probably will be the rest of the week, too." [3]

Over defense counsel's objection that the proceedings were still within the estimate the court had given the juror earlier and that the juror's circumstances were foreseeable, the judge decided to excuse Juror 809 and replace her with an alternate. The judge explained that he made that decision "not so much" because of the juror's financial concerns, although that was a "significant" concern and "the fact that her husband felt the need to come [to court] to back her up . . . [was] a significant factor." The judge told counsel that "at the end of the day," what

_____

[3] Appellant argues that the context indicates that what was going to be a problem the rest of the week was the cost of childcare, not the availability of a babysitter, but we cannot agree based on the paper transcript. The juror's answer came in response to the question interposed by the prosecutor, and was not a continuation of the juror's discussion with the court about how much the juror had been paying for babysitting. The trial judge had a much better vantage point for assessing the juror's meaning than we have.

caused him to excuse the juror was "not the financial concern" but the fact that "childcare cancelled [sic] out on her."

Appellant asserts that the trial court abused its discretion in excusing Juror 809 and replacing her with an alternate because, he argues, the court did not have a "firm factual foundation" to conclude that the juror could not have served for any part of February 11 or the next day. He argues that the juror's husband was available to care for their child, that "the trial court made no finding . . . about what hardship [the husband] would face, if any, as a consequence of missing work that afternoon," and that the court did not ask about the outcome of the juror's call to the replacement babysitter. Citing *Hinton v. United States*, 979 A.2d 663, 682 (D.C. 2009) (en banc), appellant further argues that the court's desire to avoid delaying the trial by a single afternoon was not a "'compelling'" reason that "'require[d] the juror's premature discharge.'"

Under Super. Ct. Crim. R. 24 (c), an alternate juror "shall replace a juror who, becomes or is found to be unable or disqualified to perform juror duties." In *Hinton*, we stated that "a trial court appropriately may find an empaneled juror unable or disqualified to perform juror duties . . . for example, where the court perceives a serious risk that the juror's ability to deliberate fully and fairly will be

compromised because the juror faces financial hardship . . . ." 979 A.2d at 680 (internal quotes omitted). Super. Ct. Crim. R. 24 (c) is modeled after Fed. R. Crim. P. 24 (c), and we are guided by federal courts' construction of the analogous federal rule. *Id.* at 679. "[C]ourts have long recognized that jurors with young children should be excused for cause when they are unable to obtain child-care for their children." *Johnson v. United States*, 307 F. Supp. 2d 380, 387 (D. Conn. 2003) (citing Fed. R. Crim. P. 24 (c)).[4]

We review the trial court's decision to replace a juror with an alternate for an abuse of discretion, recognizing "the trial judge's superior ability to observe the demeanor of the juror" and understanding that "[i]t is not our function . . . to second-guess a reasonable judgment of the trial court." *Hinton*, 979 A.2d at 683-84 (internal quotes omitted). "[W]e will find that the trial court exercised its

---

[4] *See also*, *e.g.*, *United States v. Alexander*, 48 F.3d 1477, 1485-86 (9th Cir. 1995) (concluding that the court acted within its discretion in replacing a juror, who was a single parent and whose child was ill, on the last full day of trial, because the juror "would not be available for the remainder of the day, and his availability beyond that point was uncertain"); *Taxiarhopoulos v. Spence*, No. CV 92-0790 (RR), 1992 WL 403112, at **5, 6 (E.D.N.Y. Dec. 28, 1992) (rejecting habeas petition and reasoning that the state trial court's decision to discharge a juror on the morning the jury was to be charged on the law — a decision the court made because the juror had failed to appear upon learning "that her babysitter was ill" and because the juror "had no one else to take care of her infant son" — was "patently reasonable").

discretion erroneously if it replaced the juror for an improper or legally insufficient reason, if its ruling lacked a firm factual foundation, or if the trial court otherwise failed to exercise its judgment in a rational and informed manner." *Id.* at 683 (internal quotes omitted).

We are satisfied upon our review of the record that the trial court exercised its judgment to replace Juror 809 "in a rational and informed manner" and did not abuse its discretion. *See id.* at 683. By the time Juror 809 was dismissed, she had appeared repeatedly before the trial judge, giving the judge an opportunity to assess her demeanor. The judge thus had an adequate basis for his conclusions that the juror's problem was "through no fault of her own" and that she had made "significant sacrifices." Although the judge did not inquire into every aspect of the juror's representations — for example, appellant is correct that the court did not press the juror as to what had transpired when she called another babysitter to replace the one who had become unavailable, and did not inquire about the consequences her husband would face if he failed to report to work in the afternoon — we have no basis for second-guessing the court's acceptance of the juror's statement that her problem would persist the rest of the week. The court could also reasonably take the husband's appearance in court that morning to support the juror's request to be excused as a strong indication that the situation

was serious and that his missing work in the afternoon was not a viable alternative.[5]

In light of Juror 809's statement that her problem would persist the rest of the week, we also cannot conclude that the court unreasonably exercised its discretion in declining to postpone afternoon proceedings (it was almost noon when the court last spoke with Juror 809) to see whether the juror's childcare problem might be resolved by the next day. Unlike in *United States v. Tabacca*, 924 F.2d 906, 915 (9th Cir. 1991), a case on which appellant relies, Juror 809 was not "certain to be available the next day," and the judge stated that he was "not prepared" to suspend the trial "given the amount of time [the court] already asked [the] jury to devote to the case." The judge's decision, made in recognition of the continued uncertainty surrounding whether Juror 809 would be able to come to

---

[5] Appellant asserts that Juror 809 "acknowledged that her husband could stay home from work that day to care for their child[.]" However, in context, we read (and we are satisfied that the trial judge understood) the juror's agreement that she had no childcare arrangements for the day other than her husband as an acknowledgment that her husband was available until he had to go to work at 1:00 p.m.

court, was like decisions that other appellate courts have upheld against claims of abuse of discretion.[6]

Wherefore, the judgment of the trial court is

*Affirmed.*

---

[6]     *See*, *e.g.*, *State v. Brown*, 552 S.E.2d 390, 396-97 (W. Va. 2001) (no abuse of discretion where the court replaced a juror with an alternate prior to jury deliberations after the juror telephoned to say that he would be late because of a flat tire; reasoning that "we do not believe that the trial court acted unreasonably in choosing to dismiss the tardy juror rather than wait on his arrival given the fact that the giving of jury instructions, closing arguments, and jury deliberations were expected to be lengthy, and alternate jurors were available"); *United States v. Rodriguez*, 573 F.2d 330, 331-32 (5th Cir. 1978) (no abuse of discretion where the juror was replaced with alternate on third day of trial when the juror went to work instead of reporting to court, and the judge made no further inquiry as to the juror's absence, such as attempting to reach the juror by phone or issuing a bench warrant).